**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN HUDLETON,<br><br>  Plaintiff,<br><br>  v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>  Defendant. | Case No. 1:11-CV-01646-LJO-SMS<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING THAT THE COURT AFFIRM DENIAL OF BENEFITS AND ORDER JUDGMENT FOR COMMISSIONER |

Plaintiff Erin Hudleton, by her attorney Sengthiene Bosavanh, seeks review of the final decision of the Commissioner of Social Security that she is not entitled to benefits under the Social Security Act. The matter is before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge. The undersigned finds the decision of the Administrative Law Judge ("ALJ") to be supported by substantial evidence in the record as a whole and based upon proper legal standards, and recommends that the Court affirm the Commissioner's denial of benefits.

I.   **Procedural History**

Plaintiff's previous application was denied in 2002. AR 124. In November 2008, she again applied under Titles II and XVI of the Act, claiming disability since June 2004.[1] The agency denied benefits. On June 2, 2010, Plaintiff appeared and testified before ALJ Laura Speck Havens. On July 22, 2010, the ALJ found her not disabled. The Appeals Council denied review. Plaintiff appealed.

---

[1] Title II benefits are retroactive for twelve months. Title XVI benefits are not retroactive. 20 C.F.R. §§404.621, 416.335.

1

## II. Factual Record

### A. Plaintiff's Testimony

Plaintiff was born in 1971 and was age 39 at the hearing. She has a limited education and past relevant work as a security guard and child caregiver or monitor. Plaintiff said she could not work due to lupus, degenerative disc disease, peripheral neuropathy and breathing problems. The lupus caused a "burning, stabbing" pain in her joints, limbs, and back. AR 39, 48. Even between flare-ups, she had back pain made worse by obesity. AR 49. She was 5'6" and weighed 240 pounds. AR 39. She had body pain "all the time." AR 127. She said her peripheral neuropathy was increasing. She was prescribed a walker to assist in her walking. AR 160. The pain had increased to the point where she sometimes had to crawl to the bathroom. AR 160, 167.

Plaintiff lived in a duplex with her six-year-old son and her boyfriend. AR 41. She could dress and bathe herself without help, but could not do chores around the house because of pain. She tried to cook, but it was hard to concentrate. She washed dishes. Either her boyfriend or her friend, Ms. Mitchell, would come over to assist with certain chores. Plaintiff said she lost interest in hobbies, but watched television four to five hours per day. She could drive for probably ten minutes before experiencing back problems. AR 40-42.

Her medication made her drowsy, tired, and weak. AR 43. She could walk for 10 minutes and sit for 30 minutes. She could only lift an item such as a mop, though she clarified that she could not mop. In addition, she testified that she felt pain in her legs and hands and had shortness of breath due to lung disease. Injections in her back had helped for about a month. Her lupus would flare up three to five times a year, lasting three to four weeks. During flare-ups she could not walk and had to elevate her feet. She had to lie down three to four times a day. She could not have back surgery because of her lung disease. AR 49-50.

### B. Medical Record

#### 1. Lupus

Plaintiff's rheumatologist, Dr. Donald Powell, stated that she was first diagnosed with lupus in 1996. AR 296. Medical records from her primary care physician, Raissa Hill, D.O., show a history of complaints from lupus through at least the date of the alleged disability. However, no conclusive

2

objective medical evidence confirmed recent flares related to lupus. As far as objective medical evidence of lupus, Plaintiff was noted as having skin issues, but these were attributed to dermatitis. AR 201, 246. While Plaintiff has complained of joint pain and neuropathy, the ALJ observed that the results had not been fully conclusive as to the etiology of her pain. February 3, 2009 laboratory results showed the Plaintiff had negative antinuclear antibody (ANA) tests results and were negative for rheumatoid factor as well. AR 289-90.

### 2. Neuropathy

In February 2008, Dr. Hill recorded "acute" neuropathy, and in September 2008 "chronic" neuropathy, although she could not determine the cause. Hand x-rays from two years earlier showed no abnormalities. AR 286.

In October 2008, Plaintiff was referred to a neurologist, Dr. Warren Clift. AR 221-23. He noted a "give sensation" on strength testing in the upper extremities. Plaintiff reported she could not use her left upper extremity and could not approximate a handgrip in either hand. She had a limited (90%) range of motion in the neck with tenderness throughout the spine and paraspinal muscles. However, her gait and station were normal, and she could perform some heel walking, toe walking, and tandem walking. Romberg's position was "held fairly well." While she reported she could not attempt deep knee bending or hop on either foot, heel-to-shin testing was done well and deep tendon reflexes were symmetrical in the upper extremities at a trace to 1+, knee jerks and ankle jerks were absent, and plantar responses were downgoing. Plaintiff showed "patchy hyperesthesia affecting the distal four extremities" and "decreased vibration," particularly affecting the left extremities. She had extreme tenderness in the left carpal tunnel. Dr. Clift opined that these findings strongly suggested radiculopathy and neuropathy as well as possible carpal tunnel syndrome. Her condition could also represent sciatica. He recommended EMG and nerve conduction studies.

In November 2008, Dr. Clift performed these tests on Plaintiff's lower extremities. AR 320-30. The EMG studies were essentially within normal limits. The nerve conduction study showed moderately severe neuropathy, both sensory and motor, very likely related to her lupus. However, Plaintiff also reported that the pain from her neuropathy was well controlled by Neurontin, Atarax, and Norco. The following week, Dr. Clift performed these same tests on Plaintiff's upper

3

extremities. Again, the EMG was normal, while the nerve conduction studies showed diffuse moderate neuropathy changes, both sensory and motor, very likely related to her lupus. Also in November 2009, Dr. Clift opined that Plaintiff could do sedentary work, including sitting for six hours and standing and/or walking for four hours in an eight hour day. AR 331.

Dr. Clift continued to treat Plaintiff through April 2010. Subsequent treatment notes indicated normal objective findings despite her allegations of swelling in her joints. AR 311-12, 315-17. In a questionnaire from June 2010, Dr. Clift again opined that Plaintiff could do sedentary work, which the questionnaire defined to include sitting for six hours and standing and walking for two hours in an eight-hour day. However, in the same form, he also indicated that Plaintiff could sit for five hours and stand or walk for two hours in an eight-hour day. He stated that she had been disabled to this degree since 2001. AR 343.

### 3. Back Pain and Obesity

Plaintiff complained of back pain for several years. AR 192-223. Although she had had muscle spasms in the back, straight leg raising testing was generally negative. AR 192, 203, 224. X-rays of Plaintiff's lumbar spine from December 2007 revealed minimal discogenic and spondylolytic changes. AR 192. An October 2008 MRI of her lumbar spine revealed mild degenerative disc disease at L1-L2, L4-L5 and L5-S1 and mild focal disc protrusion to the right of midline at L5-S1 resulting in compression and posterior displacement of the right S1 nerve root. AR 287.

In November 2008, Plaintiff was evaluated by Dr. Moris Senegor, a neurosurgeon. AR 224-25. Her gait was labored and her range of motion was reduced to about 20% in the lumbar spine, but she had normal motor strength, normal sensation and no neurological deficits. He diagnosed lumbar disc degeneration and lumbar disc herniation with nonradicular low back pain, but also noted that she was not a surgical candidate due to obesity, lupus and restrictive lung disease.

In January 2009, Plaintiff saw consultative examiner Edwin Swillinger, M.D. AR 230-34. Dr. Swillinger found that getting a history from Plaintiff was a "major challenge," as she "climbs all over" any symptom he asked about. During the physical examination, all of her responses seemed to be "tremendously exaggerated," even when he touched her with a stethoscope. She had pain in all her joints, but it "comes and goes and varies intensities from time to time," "always a different area."

4

While she had "questionable positivity" to the Romberg test, Dr. Swillinger was "not sure that it is real" and found that "essentially her coordination is good." Plaintiff could get onto the examining table without assistance. Her range of motion was essentially within normal limits in all joints, including the lumbar spine. In addition, straight leg raising was negative and the claimant had normal muscle bulk and tone, normal strength in the upper and lower extremities bilaterally, normal grip strength, normal deep tendon reflexes, and sensation intact throughout.

Plaintiff was evaluated by Dr. Tu Nguyen in September 2009. AR 304-07. She was slow to ambulate with some antalgic gait, favoring the left leg. Physical examination revealed that Plaintiff was "exquisitely tender" to palpation of the lower back, bilaterally and in the midline. Flexion and extension were limited in the back due to pain, but she did not have any greater trochanter or SI joint tenderness. While sensation was decreased, the motor examination and reflexes were intact. Plaintiff had a positive straight leg raising test with reproducible pain in the low back but without any radiation of pain to the legs or buttock area. Her examination was significant for myofascial pain with a component of "possible radicular nature," but he noted that these did not correlate with the MRI findings. He further noted that it was not clear whether Plaintiff had "true S1 nerve root sided neuropathy" based on her history and examination. Plaintiff subsequently received epidural injections from Dr. Nguyen, although she reported minimal relief from them. AR 298-303.

Plaintiff has had marked and poorly controlled obesity. In January 2009, she reported to Dr. Hill that she would wake in the night and cook herself French fries. During Dr. Nguyen's September 2009 evaluation, Plaintiff expressed that she felt unable to accomplish his recommended weight loss goals and felt very hesitant to continue any weight loss program. She did not feel that physical therapy, non-opioids, or weight loss would relieve her pain. Dr. Nguyen felt that she had not made an honest attempt at these options. He told her that he "highly recommended" these options and warned that opioids could "in the long run be counterproductive."

**4.  Lung Disease**

Examination of Plaintiff's lungs has generally shown that they were clear to auscultation and percussion. While she had an exacerbation of asthma in 2008, in September 2008 this was deemed stable. AR 196.

Plaintiff was referred to Dr. Ronald Kass for an evaluation for her persistent complaints of shortness of breath. AR 236-44. During the initial evaluation in December 2008, her lungs were clear to auscultation. She was scheduled for a pulmonary function test (PFT) and polysomnogram to evaluate her complaints of hypersomnia with sleep apnea. The PFT showed that Plaintiff had moderate restrictive pulmonary impairment with low lung volumes and low diffusion capacity with pulmonary fibrosis or lung resection. The TLC and RV were moderately decreased, and FEV1 and FVC were mildly decreased, but their ratios were normal. Dr. Kass opined that the results showed a mild restrictive defect with low lung volumes and decreased diffusion capacity consistent with interstitial lung disease. She was negative for sleep apnea. Plaintiff also had minimal rhonchi with a few bilateral crackles upon the chest examination in January 2009. Dr. Kass diagnosed this as pneumonitis, probably due to lupus. However, Plaintiff was noted as much improved on that date. Moreover, while a chest CT scan showed bilateral pulmonary parenchymal disease, no discrete pulmonary mass or nodule was identified. The chest x-ray showed no acute process.

### C.  Testimony of Vocational Expert

At the hearing, Susan T. Moranda, an impartial vocational expert, stated that Plaintiff had a work history of security guard (light, 3) and child caregiver/monitor (medium, 3).[2] She then assumed a person of Plaintiff's age (a "younger individual"), education (limited), and work history, and considered hypotheticals involving this person's RFC. *Cf.* 20 C.F.R. §404.1560(c)(1).

The first hypothetical was posed by the ALJ. In her written decision, she ascribed this RFC to Plaintiff. The person could lift and carry 10 pounds occasionally, less than 10 frequently; could sit six hours, stand two, and walk two out of eight; could never push or pull with the legs or climb ladders; could occasionally climb stairs, balance, stoop, bend, kneel, crouch and crawl; and must avoid moderate exposure to heights, moving machinery, humidity, dust, fumes, smoke, temperature extremes and vibrations. Ms. Moranda stated that the person could not perform Plaintiff's past work, but could do representative occupations such as charge account clerk (sedentary, 2—10,000

---

[2] Each job title is followed by a strength rating and a Specific Vocational Preparation number in parentheses. The strength rating captures the physical demands and frequency of certain basic activities. The frequency may be "never," "occasional" (up to one-third of the workday), "frequent" (from one-third to two-thirds), or "constant" (two-thirds or more). The Specific Vocational Preparation ranks, from one to nine, the time required to learn facility in the job. *See* Dictionary of Occupational Titles (4th ed.1991) Appendix C.

6

positions in California); small parts assembler (sedentary, 2—7,500 positions, accounting for a reduction of 50% due to the person's limitations), and cashier (sedentary, unskilled—14,000 positions). Although the DOT classified the cashier position as light work, California labor market studies indicated that there are cashiers who work at the sedentary level.

Plaintiff's attorney also asked how the positions would be affected if the person required a cane when standing. Ms. Moranda stated this would not have a "huge impact" because the jobs are sedentary and involve sitting most of the day. On the other hand, if the person needed a sit-stand option, this would "considerably erode the jobs" because they do not "technically" allow for an "automatic" sit-stand option. The same would apply to a sit-stand option combined with a cane.

Plaintiff's attorney asked about positions if the person in the first hypothetical had to miss work due to a lupus flare-up, between three to five times a year, from three weeks to more than a month at a time. Ms. Moranda stated that this person would have no jobs. Also, if the person had medicinal side effects including drowsiness which limited the ability to concentrate to 30 minutes at a time, that would "affect the jobs" because they require an "above average concentration."

**III.     The ALJ's Decision**

The ALJ found that Plaintiff had not met her burden under the Act to show that she was disabled. Pursuant to 42 U.S.C. § 1382c(a)(3)(A), to be disabled, a claimant must be unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of at least twelve months. The ALJ followed the five-step sequential analysis in 20 C.F.R. §§ 404.1520 (a)-(f): [3]

| | | |
|---|---|---|
| Step one: | | Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two. |
| Step two: | | Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate. |
| Step three: | | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? |

---

[3] The relevant regulations governing disability insurance benefits ("DIB") and supplemental security income ("SSI") are virtually identical. Only the DIB regulations will be cited in this opinion. Parallel SSI regulations correspond with the last digits of the DIB citation (e.g., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

7

|  |  |
|---|---|
|  | If so, the claimant is automatically determined disabled. If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

Plaintiff had not worked since June 30, 2004. Her severe impairments were obesity, restrictive lung disease, lupus, peripheral neuropathy and degenerative disc disease. She was not disabled under a listing. Her RFC corresponded to the first hypothetical considered by the vocational expert: she could not do her past work but could do other work. Thus she was not disabled.

## IV. Discussion

### A. Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. This Court must uphold the decision if the ALJ applied the proper legal standards and made findings supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla," *id.,* but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975). The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the Court may not substitute its judgment. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.1996).

### B. The ALJ Properly Discounted Plaintiff's Subjective Complaints

Plaintiff asserts, exceedingly briefly and with minimal support, that the ALJ gave insufficient reasons to discredit her testimony as to her limitations. However, the ALJ provided a valid basis for finding Plaintiff not fully credible, and her reasons were supported by substantial evidence.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Absent affirmative evidence of malingering, and assuming impairments that could reasonably give rise to the reported symptoms, the ALJ must assess the credibility of the complaints. *See* 20 CFR 404.1529(c); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). Factors to consider include the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; precipitating or aggravating factors; and measures taken to alleviate the symptoms—including medication (type, dosage, effectiveness, and side effects), other medical treatment, and non-medical measures such as lying down or changing positions. *Id*. An ALJ may also consider ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). If the ALJ decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991).

As an initial matter, there was evidence that Plaintiff was malingering. As noted above, Dr. Swillinger reported that Plaintiff's responses to physical examination were extremely exaggerated. It was a major challenge to get a history: "Anything I mention she has and if it is pain or if it is sweating, or if it is any symptom or any sign, she just climbs all over it and all of her responses of her physical examination are tremendously exaggerated whenever I touch her with a piece of equipment, even a stethoscope." Dr. Swillinger's observations gave the ALJ reason to reject Plaintiff's subjective complaints. *See Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993) (claimant's complaints rejected because physician reported his symptoms were amplified).

The ALJ also considered Plaintiff's inconsistent statements. In December 2008, Plaintiff stated that Dr. Clift told her to apply for supplemental security income as she could not work. However, the ALJ could not find any evidence of this in Dr. Clift's records, and in both his medical source statements he stated that Plaintiff was capable of sedentary work. AR 331, 343. While Plaintiff argues that the ALJ should have credited her in light of Dr. Clift's statement that she could

only sit for five hours a day, Plaintiff herself stated that sitting bothered her only "occasionally." AR 176.

The objective findings and opinion evidence also contradicted Plaintiff's allegation of disabling pain. While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor. While Plaintiff had long complained of lupus, to the point of telling Dr. Swillinger that she had given up looking for work, the ALJ noted that no conclusive objective medical evidence confirmed that Plaintiff had recent flares related to lupus, and there was no objective medical evidence supporting her allegation of swelling in her joints.

The ALJ also properly considered Plaintiff's daily activities. She found that Plaintiff routinely engaged in daily activities that were inconsistent with her complaints of disabling pain. Although Plaintiff testified that she had pain while standing, walking, and doing laundry, her written statement indicated that she continued to do household chores. AR 176-77. She could lift her 5-year-old son occasionally and could carry in two weeks of groceries from her car, one or two bags at a time. Despite back pain and numbness, she could drive, ten to fifteen minutes or five to ten miles at a time. The ALJ also considered Plaintiff's failure to follow treatment. Despite being advised to keep active and lose weight as part of her treatment, Plaintiff told Dr. Nguyen that she did not believe exercise or weight loss would be helpful.

It was up to the ALJ, the trier of fact, to evaluate Plaintiff's credibility. *Fair*, 885 F.2d at 604. The ALJ made "findings sufficiently specific" to permit this Court to conclude that she "did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

**C.     The ALJ Properly Discounted Medical Opinion Evidence**

The ALJ found that Plaintiff could sit six hours, stand two hours, and walk two hours in an eight hour workday. Plaintiff asserts that the ALJ gave insufficient reasons to reject medical opinions of Drs. Clift, Hill, and Powell that were inconsistent with this finding. When evaluating a medical opinion, the factors that the ALJ should consider include (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination and the (b) nature and extent of the treatment relationship; (3) supportability; (4)

10

consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d). When considering supportability, a medical opinion may be disregarded to the extent that it is premised on the claimant's discredited complaints. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir.1999).

### 1. Dr. Clift

In November 2009, Dr. Clift opined that Plaintiff could do sedentary work, including sitting for six hours and standing and/or walking for four hours in an eight hour day. AR 331. In a questionnaire from June 2010, Dr. Clift again opined that Plaintiff could do sedentary work, specifically defined to include sitting for six hours and standing and walking for two hours in an eight-hour day. However, the ALJ observed that in the same form, Dr. Clift also indicated that Plaintiff could sit for five hours and stand or walk for two hours in an eight-hour day. He stated that she had been disabled to this degree since 2001. AR 343.

The ALJ gave Dr. Clift's opinion "substantial weight … to the extent that it was consistent with the record as a whole," and found that Plaintiff could sit for six hours in a workday. Plaintiff contends that the ALJ improperly rejected Dr. Clift's June 2010 opinion that Plaintiff could sit for five hours, not six. Here, Dr. Clift's opinion was contradicted by other medical opinions and evidence and was internally inconsistent. Accordingly, the ALJ could reject it for "specific and legitimate reasons" supported by substantial evidence in the record. *Orn*, 495 F.3d at 632-33.

The objective evidence and opinion evidence supports the ALJ's determination that the record evidence was more consistent with a six-hour limitation, the opinion Dr. Clift expressed in 2009. For example, treatment notes consistently showed normal objective findings despite Plaintiff's allegations of swelling in her joints. Dr. Swillinger, an examining physician, reported that straight leg raising was negative and that Plaintiff had normal muscle bulk and tone, normal strength in the upper and lower extremities bilaterally, normal grip strength, normal deep tendon reflexes, and sensation intact throughout. Dr. Swillinger found no evidence of effusion or deformities and could not elicit trigger points. He opined that Plaintiff could stand for four hours and sit for four to six hours. The ALJ gave "some weight" to this decision, differing as to the exact limitations but finding that Dr. Swillinger's opinion was supported by objective medical findings from the examination.

11

Similarly, the state agency reviewing physicians' opinions supports the ALJ's conclusion that Dr. Clift's initial functional assessment was more probative and that Plaintiff retained the capacity to perform sedentary work. The physicians reviewed the evidence and found that, taken as a whole, the record supported a sedentary residual functional capacity and a finding that Plaintiff could sit eight hours and stand and/or walk two hours in an eight hour day. Because this opinion was based on support in specific clinical findings of record, it constituted substantial evidence supporting the ALJ's decision adopting Dr. Clift's earlier opinion that Plaintiff could sit for six hours.

Additionally, x-rays of Plaintiff's lumbar spine revealed minimal discogenic and spondylolytic changes. Straight leg examinations were generally negative. An October 2008 MRI of Plaintiff's lumbar spine revealed mild degenerative disc disease. The MRI also revealed a mild focal protrusion to the right S1 nerve root.

The ALJ noted that although Plaintiff's rheumatologist, Dr. Powell, stated that Plaintiff was diagnosed with lupus in 1996, there was no conclusive objective medical evidence confirming recent flares related to lupus. Further, while Plaintiff consistently complained of joint pain, test results had not been fully conclusive as to the etiology of her pain. Laboratory test results from February 2009 were negative for ANA and negative for rheumatoid factor. (As the Commissioner explains in her brief, a positive test for the presence of these antibodies—produced by a patient's immune system—indicates a stimulated immune system. Most people with lupus have a positive ANA test.)

Plaintiff essentially contends that the ALJ was not permitted to rely on Dr. Clift's first opinion and was required to adopt his second opinion. However, the two opinions represented a conflict that the ALJ was charged to resolve. *See Magellanes v. Bowen*, 881 F.2d 747 (9th Cir. 1989) (ALJ is responsible for determining credibility and resolving conflicts in medical testimony). Accordingly, the ALJ reasonably and properly weighted the evidence of record and adopted the opinion that was most consistent with the record as a whole.

**2.     Drs. Hill and Powell**

Plaintiff asserts, exceedingly briefly and with minimal support, that the ALJ gave insufficient reasons to reject the opinions of Drs. Hill and Powell. However, the ALJ reasonably weighed the medical evidence and adopted the opinions that were consistent with the record as a whole.

Dr. Powell opined that Plaintiff was diagnosed with systemic lupus erythematosus in 1996 and was unable to work due to chronic psychosis that was "thought to be a neuropsychiatric manifestation of her lupus." Dr. Powell was a treating physician, and the ALJ could reject his contradicted opinion for "specific and legitimate reasons" supported by substantial evidence in the record. *Orn*, 495 F.3d at 632-33. The ALJ found that Dr. Powell's opinion was not supported by the objective medical findings. As previously discussed, this evidence was sufficient to support the ALJ's RFC determination. The ALJ specifically noted that the objective medical evidence called into question the severity of Plaintiff's lupus. She also noted that Dr. Powell's opinion did not account for the fact that Plaintiff had been able to work consistently until 2004, even though she had been diagnosed with lupus since 1996.

Dr. Hill was also a treating physician. She opined that Plaintiff suffered from a number of chronic medical conditions and had chronic pain from her peripheral neuropathy and lumbar disc disease as well as "frequent exacerbations of her restrictive lung disease causing period of difficulty breathing and frequent infections," and that "due to these conditions she has been disabled and unable to work." Again, the ALJ referred to the above-mentioned objective medical and opinion evidence as grounds for rejecting Dr. Hill's opinion. The ALJ also pointed out that Dr. Hill's opinion essentially consisted of a conclusion that Plaintiff was unable to work, a question reserved to the Commissioner. Of course, the same is true of Dr. Powell's opinion.

**V.**     **Conclusion**

A review of applicable law and facts indicates that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly, the undersigned recommends that the District Court affirm the Commissioner's determination.

These Findings and Recommendations will be submitted to the Honorable Lawrence J. O'Neill, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1). On or before **THIRTY DAYS from the entry of this decision,** any party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that, by failing to file objections within the specified time,

she may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

**DATED:  4/26/2013**                              **/s/ SANDRA M. SNYDER**
                                                                    **UNITED STATES MAGISTRATE JUDGE**